## UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

In re:

CYBERCO HOLDINGS, INC.,

     Debtor.

_____/

Case No. HG 04-14905

In re:

TELESERVICES GROUP, INC.,

     Debtor.

_____/

Case No. HG 05-00690

## <u>OPINION RE: HUNTINGTON NATIONAL BANK'S MOTIONS FOR SUBSTANTIVE CONSOLIDATION</u>

The Huntington National Bank ("Huntington") has filed separate motions to substantively consolidate the Chapter 7 cases of Cyberco Holdings, Inc. ("Cyberco") and Teleservices Group, Inc. ("Teleservices"). Both motions are denied.

### PROCEDURAL BACKGROUND

Cyberco and Teleservices are related companies because of common ownership. On December 9, 2004, creditors of Cyberco commenced an involuntary Chapter 7 proceeding against it. The involuntary petition was filed only days after a state court had ordered a receiver to take control of both entities. The receiver did not oppose the Cyberco petition and, as a consequence, an order for relief was filed the next day. Moreover, the receiver himself filed a voluntary Chapter 7 petition on behalf of Teleservices a month later.

Thomas Richardson is the trustee of the Cyberco estate and Marcia Meoli is the trustee of the Teleservices estate.[1] Both trustees are vigorously pursuing avoidance actions against Huntington under various sections of the Bankruptcy Code.[2] Trustee Richardson contends that Huntington received substantial preferential transfers in connection with the indebtedness owed to it by Cyberco.[3] As for Trustee Meoli, she claims not only that Huntington itself received huge fraudulent transfers from Teleservices, but also that Huntington received even larger amounts as a subsequent transferee of other fraudulent transfers made by Teleservices to Cyberco.[4]

Part of Huntington's response to these avoidance actions has been its own request to substantively consolidate the two separate estates into a single estate. Substantive consolidation, when ordered, typically involves the combination of the affected estates' assets with all creditors then sharing equally from the common pool.[5] However, in this instance, Huntington contends that consolidation of the two estates would also require a reassessment of the avoidance actions that have been brought against it. Specifically, it asserts that:

---

[1]Richardson had originally been the trustee of both bankruptcy estates. However, in August 2007, the United States Trustee replaced Richardson with Meoli as the Teleservices trustee.

[2]11 U.S.C. §§ 101, *et seq.* Debtor's petition pre-dates the October 17, 2005 effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. No. 109-8, § 1501(b)(1), 119 Stat. 23. Unless otherwise indicated, all citations in this opinion to the Bankruptcy Code will be to the Bankruptcy Code as written prior to the BAPCPA amendments.

[3]The Cyberco complaint originally included ten counts against Huntington. However, four counts were voluntarily dismissed, including a count alleging that Huntington had aided and abetted fraud. This court also dismissed on motion four other counts, including counts alleging unjust enrichment and fraudulent transfer. Consequently, the only counts that remain in the Cyberco complaint are the counts related to alleged preferences received by Huntington from Cyberco.

[4]*Cf.* 11 U.S.C. §§ 548 and 550(a)(2).

[5]*See, e.g., Union Savings Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.)*, 860 F.2d 515, 518 (2nd Cir. 1988) (citing 5 *Collier on Bankruptcy* § 1100.06, at 1100-32 n. 1 (L. King ed., 15th ed. 1988).

2

- For purposes of any analysis of the depletion of estate assets, the consolidated estate shall be the relevant estate.

- For purposes of determining whether Huntington gave "value" for any pre-petition transfers to it from Cyberco or Teleservices, value will be appraised in light of the post-petition effect of such transfers on the consolidated estate, and

- Pre-petition transfers between the consolidated entities will be analyzed in light of their effect post-petition on the consolidated estate.[6]

Obviously, Huntington's hope is that these reassessments will then result in a substantial reduction of what the two trustees otherwise claim must be returned to their two separate estates.

The consolidation motions were tried at the same time as certain aspects of Trustee Meoli's fraudulent transfer action against it were tried.[7] A twelve day trial was then conducted over a three month period with closing arguments being made in January 2010. Post-hearing briefs have also been filed.[8]

---

[6]Huntington's Post-Trial Brief in Support of Substantive Consolidation at 12-13, *In re Teleservices Group, Inc.*, No. 05-00690 [DN 317] (Bankr. W.D. Mich. Jan. 21, 2005), *In re Cyberco Holdings, Inc.*, No. 04-14905 [DN 1187] (Bankr. W.D. Mich. Dec. 9, 2004) (hereinafter "Def. Post-Hr'g Br.").

[7]The adversary proceedings to recover the fraudulent transfers and the two consolidation motions were combined under FED. R. BANKR. P. 7042 because they appeared at that time to share a common issue – to wit, whether Huntington's own dealings with Cyberco and Teleservices negated both its good faith defenses to the fraudulent transfer action and its ability to seek substantive consolidation under the two motions. The trial of the adversary proceeding was then bifurcated so that only some of the issues related to the fraudulent transfer action, including whether Huntington had acted in good faith, would be tried together with the two substantive consolidation motions. The court will address Huntington's good faith in a separate opinion to be issued shortly in connection with the adversary proceeding.

[8]This court has jurisdiction pursuant to 28 U.S.C. §§ 157(b)(1) and 1334 and W.D. Mich. LCivR 83.2 (W.D. Mich.). This is a core proceeding, 28 U.S.C. §§ 157(b)(A), and (O) and, therefore, the order that will enter with this opinion is appealable pursuant to 28 U.S.C. § 158. What follows are the court's findings of fact and conclusions of law pursuant to FED. R. BANKR. P. 7052 and FED. R. CIV. P. 52. *See also* FED. R. BANKR. P. 9014(c).

3

## FACTS

Huntington was apparently[9] one of many victims of a massive fraud perpetrated by Barton Watson and others through both Cyberco and Teleservices.[10] Huntington itself did not get involved with Cyberco until 2002. Watson[11] had wooed Huntington to become its bank with the story that its current lender, which was in Chicago, had recently been acquired and that Cyberco was looking for a more local relationship. What Watson did not mention was that its current lender had actually asked Cyberco to leave.

Huntington immediately provided Cyberco with a new $9 million line of credit and it then increased that line to $13 million shortly thereafter. In addition, Huntington financed various equipment acquisitions and issued at least one letter of credit. All in all, Huntington's total exposure to Cyberco was in excess of $16 million by early 2004.

Cyberco had represented itself to Huntington and others as a fast growing, high-tech company on the cutting edge. This is how Huntington's own report to its shareholders described Cyberco just after Huntington landed the account:

> With its world headquarters based in Grand Rapids, Michigan, CyberNET [i.e., Cyberco] is the internationally recognized front-

---

[9]This court uses "apparently" only because Huntington has been accused of being complicit in the fraud. That issue is not before this court although it has been raised by certain creditors in separate litigation brought against Huntington in the district court for this district. Huntington's involvement with Cyberco, whether complicit or not, also has a bearing on whether Huntington acted in good faith in connection with Teleservices' adversary proceeding to recover fraudulent transfers from Huntington.

[10]The ownership of both Cyberco and Teleservices was never altogether clear. However, it appears that both were controlled through Krista Kotlarz-Watson, Barton Watson's wife.

[11]Watson committed suicide shortly after the fraud was revealed. However, witnesses who were familiar with Watson described him as the scheme's mastermind and as a person who controlled others through intimidation. Therefore, the court, for convenience, will refer to only Watson as the perpetrator of the fraud even though others actively assisted him in the endeavor.

> runner in the design, deployment and operation of information technology infrastructures necessary to put mission-critical corporate data into the hands of users.

Trustee Trial Ex. 30.

Cyberco had in fact started as a legitimate business in the early 1990s and Cyberco still had some actual customers in 2002. However, by that time Watson was resorting more and more to fraud to generate Cyberco's revenues. Indeed, virtually all of Cyberco's revenue was attributable to fraud when it finally collapsed in late 2004.

Watson's scheme was as simple as it was brazen. He sought out banks, leasing companies, and other similar institutions on the pretext that Cyberco needed more computer equipment for its rapidly growing global business. However, Cyberco never acquired any of the equipment for which it had received funding. Rather, Watson would represent that Teleservices was Cyberco's source for the desired equipment and, as a consequence, the finance companies would forward the necessary funds to Teleservices on the mistaken belief that Teleservices had something to sell.[12] Watson would

---

[12]If the acquisition was through a leasing arrangement, the financing company would have actually been the purchaser of the equipment. However, some financing companies chose instead to loan money to Cyberco to make the purchase from Teleservices and to then take a purchase money security interest in what was supposed to have been sold by Teleservices to Cyberco. The court points out this difference because Huntington has at least intimated that Cyberco should be treated as the initial recipient of whatever proceeds were received under any of these alternative loan arrangements and, as a consequence, Cyberco has its own fraudulent transfer action against Teleservices. In other words, Huntington contends that Cyberco was getting nothing in exchange for all of the money it was transferring to Teleservices on account of these loans and, as such, that money should be returned to the Cyberco estate.

However, James Horton, Cyberco's president, testified that while Cyberco may have been the borrower of the funds being advanced, Cyberco never controlled the funds' disposition. Rather, he testified that the lender in each instance insisted that the funds be deposited directly with Teleservices since the specific purpose of the loan was to acquire equipment supposedly being purchased by Cyberco from Teleservices.

In bankruptcy parlance, this is known as earmarking and the Sixth Circuit has held that loan advances that have been earmarked in this fashion do not become property of the debtor for purposes of determining

5

then have Teleservices issue false invoices and other documents to evidence the supposed transaction. As for Cyberco, Watson packed its computer room with fake servers and he then swapped serial numbers among those servers in order to deceive the victims whenever they attempted an audit of their collateral.[13]

Teleservices, of course, did not keep its ill-gotten gains. Rather, it funneled them back to Cyberco and Cyberco in turn used what it received (1) to perpetuate the fraud by making payments on the many promissory notes and leases Cyberco had signed in connection with prior nonexistent purchases; and (2) to pay Cyberco's other operating expenses, including the handsome salaries and expense accounts of Watson and his fellow cheats. Those payments, though, were made for the most part through Huntington accounts that Cyberco had opened and Huntington otherwise facilitated these payments through various cash management services it provided. Consequently, millions and millions of dollars passed through Huntington even though Cyberco's actual indebtedness to Huntington was considerably less.[14]

---

whether an avoidable transfer has taken place. *Mandross v. Peoples Banking Co. (In re Hartley)*, 825 F.2d 1067, 1069 (6th Cir. 1987). Although *Hartley* involved a preferential transfer, the same rule should be equally applicable when a fraudulent transfer is being alleged.

[13]In hindsight, Watson's success at fooling so many sophisticated lenders seems incredible. For example, only a third to one-half of the servers on site were real. The rest were empty boxes with flashing lights. Indeed, reports are that the room in which everything was crammed was not sufficiently ventilated to withdraw the heat that would have been generated had all of the servers been in fact operational. As for the serial numbers, Watson simply used off-the-shelf label making software to print out bogus serial number tags that could be pulled off and reattached as the need arose.

[14]Huntington had intended at the outset of its relationship with Cyberco for all of Cyberco's receivable collections to be deposited in a lockbox controlled by Huntington and for Huntington to then re-advance under the line of credit based upon whatever Cyberco had generated as new accounts receivable. However, the lockbox was not used much for the now obvious reason that the fraudulently obtained money being funneled from Teleservices by 2002 had replaced legitimate accounts receivable as Cyberco's primary source of cash.

6

Huntington's relationship with Cyberco deteriorated as time progressed, and in fact, by January 2004, Huntington had followed its predecessor's suit by also asking Cyberco to leave. Six months passed, though, before Cyberco actually began to pay down its debt. Moreover, virtually all of Cyberco's legitimate business had disappeared by then. Consequently, Watson funded the loan paydown to Huntington by generating even more funds through the Teleservices scam. Indeed, it was Teleservices that made most of the paydown even though Teleservices itself had no banking relationship with Huntington. All told, Huntington was able to reduce its exposure from $12,600,000 in June 2004 to only about $600,000 just weeks before the FBI raided Cyberco in November of that same year. Trustee Trial Ex. 231-K, 153.

## DISCUSSION

Many courts have recognized substantive consolidation as an available remedy under the Bankruptcy Code.[15]   In its broadest sense, it:

---

It is difficult, then, to assess how active Huntington's revolving line of credit with Cyberco in fact was. That is, the record at this point in time is sparse as to whether Huntington actually set off against Cyberco's account balances what it was owed and then re-advanced all monies anew or whether it simply monitored Cyberco's account balances to ensure that it remained in formula. However, even if Huntington did regularly set off and then re-advance, the court suspects that the paydown of the line of credit was only momentary given Cyberco's insatiable need for cash.

[15]*See, e.g., In re Owens Corning*, 419 F.3d 195 (3rd Cir. 2005); *Eastgroup Properties v. S. Motel Ass'n*, 935 F.2d 245 (11th Cir. 1991); *Drabkin v. Midland-Ross Corp. (In re Auto-Train Corp., Inc.)*, 810 F.2d 270, 276 (D.C. Cir. 1987); *Augie/Restivo*, 860 F.2d 515; *Bruce Energy Ctr. Ltd. v. Orfa Corp. of Am. (In re Orfa Corp. of Phila.)*, 129 B.R. 404 (Bankr. E.D. Pa. 1991); *In re Standard Brands Paint Co.*, 154 B.R. 563 (Bankr. C.D. Cal. 1993); *Windels Marx Lane & Mittendorf, LLP v. Source Enterprises, Inc. (In re Source Enterprises, Inc.)*, 392 B.R. 541 (S.D.N.Y. 2008); *In re Bonham*, 226 B.R. 56 (Bankr. D. Alaska 1998); *Walter E. Heller & Co. v. Langenkamp (In re Tureaud)*, 59 B.R. 973 (N.D. Okla. 1986); *Bracaglia v. Manzo (In re United Stairs Corp.)*, 176 B.R. 359 (Bankr. D.N.J. 1995); *White v. Creditors Serv. Corp. (In re Creditors Serv. Corp.)*, 195 B.R. 680 (Bankr. S.D. Ohio 1996); *In re Alico Mining, Inc.*, 278 B.R. 586 (Bankr. M.D. Fla. 2002).

7

> treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities (save for inter-entity liabilities, which are erased).

*Genesis Health Ventures, Inc. v. Stapleton (In re Genesis Health Ventures, Inc.)*, 402 F.3d 416, 423 (3rd Cir. 2005).

However, pinning down the exact authority that empowers a bankruptcy court to impose such a remedy has proven illusive. The Bankruptcy Code itself makes no reference to "substantive consolidation" and the term "consolidate" or "consolidation," standing alone, appears in only two places.[16]

Nonetheless, modern courts are wont to say that substantive consolidation is permitted under the Bankruptcy Code through Section 105(a), which, in pertinent part, provides that:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.

*See, e.g., Walter E. Heller & Co. v. Langenkamp (In re Tureaud)*, 59 B.R. 973, 975 (N.D. Okla. 1986); *In re DRW Prop. Co. 82*, 54 B.R. 489, 494-95 (Bankr. N.D. Tex. 1985); *Gold v. Winget (In re NM Holdings Co.)*, 407 B.R. 232, 274 (Bankr. E.D. Mich. 2009). But it is just as often said that substantive consolidation is to be viewed as "a product of judicial gloss." *Union Savings Bank v. Augie/Restivo Baking Co., Ltd. (In re Augie/Restivo Baking Co., Ltd.)*, 860 F.2d 515, 518 (2nd Cir.

---

[16]Section 302(b) requires the court to consider the extent to which a husband's and wife's separate estates should be "consolidated" whenever a joint petition is filed, and Section 1123(a)(5)(C) provides that a Chapter 11 plan may be implemented through "consolidation" of the debtor with another person.

The court would further note that FED. R. BANKR. P. 1015(a) provides for the consolidation of cases when two or more petitions are pending in the same court by or against the same debtor. Subpart (b) of that same rule in turn permits "joint administration" of two or more cases pending in the same court under various circumstances.

8

1988).[17]  Indeed, courts regularly regard their ability to order substantive consolidation as deriving

from an equitable power that predates the Code.

> Substantive consolidation traces its roots to the Bankruptcy Act of
> 1898.  The Act then contained no express statutory authorization for
> consolidation, either generally or in the case of spouses.  Instead, the
> authority to order substantive consolidation was implied from the
> bankruptcy court's general equitable powers.

*Reider v. FDIC (In re Reider)*, 31 F.3d 1102, 1105 (11th Cir. 1994) (footnotes and citations omitted).[18]

*Sampsell v. Imperial Paper & Color Corp.*, 313 U.S. 215, 61 S. Ct. 904 (1941) is, in turn, frequently

cited as the seminal Act case from which this equitable remedy evolved.[19]

---

[17]*See also, In re Julien Co.*, 120 B.R. 930, 934 (Bankr. W.D. Tenn. 1990); *Helena Chem. Co. v. Circle Land and Cattle Corp. (In re Circle Land and Cattle Corp.)*, 213 B.R. 870, 875 (D. Kan. 1997); *Doctors Hosp. of Hyde Park, Inc. v. Desnick (In re Doctors Hosp. of Hyde Park, Inc.)*, 308 B.R. 311, 322 (Bankr. N.D. Ill. 2004).

[18]*See also Owens Corning*, 419 F.3d at 205 ("Substantive consolidation, a construct of federal common law, emanates from equity."); *ACC Bondholder Group v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 361 B.R. 337, 359 (S.D.N.Y. 2007); *Kroh Bros. Dev. Co. v. Kroh Bros. Mgmt. Co. (In re Kroh Bros. Dev. Co.)*, 117 B.R. 499, 501 (W.D. Mo. 1989); *In re Lewellyn*, 26 B.R. 246, 250 (Bankr. Iowa 1982); *Murphy v. Stop & Go Shops, Inc. (In re Stop & Go of Am., Inc.)*, 49 B.R. 743, 746 (Bankr. D. Mass. 1985); *In re Snider Bros., Inc.*, 18 B.R. 230, 234 (Bankr. D. Mass. 1982); *In re Vecco Constr. Indus., Inc.*, 4 B.R. 407, 409 (Bankr. E.D. Va. 1980); *United Union of Roofers Local Union No. 20 v. Ford (In re Ford)*, 54 B.R. 145, 146 (Bankr. W.D. Mo. 1984).

[19]*See also Owens Corning*, 419 F.3d at 206; *Tureaud*, 59 B.R. at 976; *Simantob v. Lahijani (In re Lahijani)*, No. SV 98-1556 GM, 2005 WL 4658490 at *6 (Bankr. C.D. Cal. Oct. 3, 2005); *In re Bonham*, 226 B.R. at 75; *Morse Operations v. Robins Le-Cocq, Inc. (In re Lease-A-Fleet, Inc.)*, 141 B.R. 869, 874 (Bankr. E.D. Pa. 1992); *Creditors Serv. Corp.*, 195 B.R. at 689 n. 4; *NM Holdings*, 232 B.R. at 273-74; *Gill v. Sierra Pac. Constr., Inc. (In re Parkway Calabasas Ltd.)*, 89 B.R. 832, 837 (Bankr. C.D. Cal. 1988); *In re Stone & Webster, Inc.*, 286 B.R. 532, 538 (Bankr. D. Del. 2002); *In re Am. HomePatient, Inc.*, 298 B.R. 152, 165 (Bankr. M.D. Tenn. 2003); *In re Coleman*, 417 B.R. 712, 725 (Bankr. S.D. Miss. 2009).
    The Sixth Circuit, though, has not given much consideration to this issue.  At most, the Sixth Circuit has acknowledged in *First Nat'l Bank of Barnesville v. Rafoth (In re Baker & Getty Fin. Serv., Inc.)*, 974 F.2d 712, 720 (6th Cir. 1992), a lower court's substantive consolidation of two cases and, in making that acknowledgment, it briefly described, in dicta, why substantive consolidation might be warranted in some cases. *Id.* at 720 (quoting *Evans Temple Church of God in Christ and Cmty. Ctr. Inc. v. Carnegie Body Co. (In re Evans Temple Church of God in Christ and Cmty. Ctr., Inc.)*, 55 B.R. 976 (Bankr. N.D. Ohio 1986)). However, *Baker & Getty* does not offer any explanation as to a court's actual authority to order such relief.

It would seem, then, that a thorough understanding of both *Sampsell* and the many other "substantive consolidation" cases decided under the former Act is crucial to any modern court's consideration of how the doctrine is now to be applied under the Code. Accordingly, the court begins by examining these cases.

"Liberal" Cases, *Sampsell*, and the Summary Seizure of Property Under the Former Act

The Act cases addressing substantive consolidation can be sorted into two groups. The more recent group spans the time period from 1966 on. *Chemical Bank New York Trust Co. v. Kheel*,[20] which is frequently cited by modern courts when discussing substantive consolidation,[21] is the earliest of these cases. Others within this group are *Flora Mir Candy Corp. v. R. S. Dickson & Co. (In re Flora Mir Candy Corp.)*,[22] *James Talcott, Inc. v. Wharton (In re Continental Vending Mach. Corp.)*,[23] *In re D.H. Overmyer Co., Inc.*,[24] *In re Commercial Envelope Mfg. Co., Inc.*,[25] *FDIC v. Hogan (In re Gulfco Inv. Corp.)*,[26] and *In re Food Fair, Inc.*[27] In fact, in *In re Vecco Construction Industries, Inc.*, the court identified all of these cases as representing a new, more liberal trend in awarding such relief.

---

[20]369 F.2d 845 (2nd Cir. 1966).

[21]*See, e.g., Augie/Restivo*, 860 F.2d at 518; *Owens Corning*, 419 F.3d at 207; *Reider*, 31 F.3d at 1105; *Auto-Train Corp. Inc.*, 810 F.2d at 276; *Bonham*, 226 B.R. at 76; *Coleman*, 417 B.R. at 725-26.

[22]432 F.2d 1060 (2nd Cir. 1970).

[23]517 F.2d 997 (2nd Cir. 1975).

[24]No. 73-B-1126 1976 WL 168421 (S.D.N.Y. Mar. 26, 1976).

[25]No. 76-B-2354 1977 WL 182366 (Bankr. S.D.N.Y. Aug. 22, 1977).

[26]593 F.2d 921 (10th Cir. 1979).

[27]10 B.R. 123 (Bankr. S.D.N.Y. 1981).

> [S]ubstantive consolidation of a parent corporation and its subsidiaries has been increasingly utilized as a mechanism to deal with corporations coming within the purview of the Act. . . . The liberal trend in allowing consolidation of proceedings, as evidenced by recent case law, arises from the result of increased judicial recognition of the widespread use of interrelated corporate structures by subsidiary corporations operating under a parent entity's corporate umbrella for tax and business planning purposes.

4 B.R. 407, 409 (Bankr. E.D. Va. 1980).[28]

*Sampsell*, in turn, falls into the earlier, more "traditional" group of Act cases against which *Kheel*, *Flora Mir*, and these other so-called liberal cases were being contrasted. It is ironic, then, that *Sampsell* is not particularly representative of this other category of consolidation cases. As Bankruptcy Judge Shefferly observed:

> [A] careful reading of *Sampsell* reveals that the Supreme Court did not actually hold substantive consolidation to be an available remedy for bankruptcy courts, nor did it address what showing would be necessary to invoke the doctrine of substantive consolidation.

*Simon v. ASIMCO Technologies, Inc. (In re Am. Camshaft Specialties, Inc.)*, 410 B.R. 765, 778 (Bankr. E.D. Mich. 2009).[29]

---

[28]*See also In re Murray Indus.*, 119 B.R. 820, 828-29 (Bankr. M.D. Fla. 1990).

[29]Other courts have made the same observation. For example, in *Owens Corning*, the court said this about *Sampsell*:

> Adding to these remedies, the Supreme Court, little more than six decades ago, approved (at least indirectly and perhaps inadvertently) what became known as substantive consolidation.
>
> * * *
>
> In deciding that the creditor should not be accorded priority (thus affirming the bankruptcy referee), the Supreme Court turned a typical turnover/fraudulent transfer case into the forebear of today's substantive consolidation by terming the bankruptcy referee's order (marshaling the corporation's assets for the benefit of the debtor's estate) as "consolidating the estates."

419 F.3d at 206 (citation omitted). *See also Tureaud*, 59 B.R. at 976; *Lease-A-Fleet*, 141 B.R. at 874;

This is not to say, though, that *Sampsell* has nothing to do with the evolution of substantive consolidation under the former Act. It did, after all, address the prioritization of claims once a consolidation is accomplished. However, it is crucial to understanding *Sampsell* that the consolidation referenced in that opinion had come about by the lower court's uncontested application of by then a well established bankruptcy remedy – the trustee's seizure of what ostensibly appeared to be another person's property on the theory that it in fact belonged to the estate.[30]

Like the Bankruptcy Code, the former Act vested "title to all property of the bankrupt . . . in the trustee, as of the date of filing the petition in bankruptcy." *Maggio v. Zeitz*, 333 U.S. 56, 62, 68 S. Ct. 401, 404 (citing 11 U.S.C. § 110 (repealed)). However, unlike the Bankruptcy Code, the bankruptcy estate's property under the former Act also included property that the debtor had fraudulently transferred to third parties prepetition. *Id.*[31] As a consequence, a trustee's effort to recover previously transferred property frequently took the guise of a turnover proceeding whereby the trustee would demand the recipient of the fraudulent or other suspect transfer to return to the estate what literally, at least under the bankruptcy laws then, had belonged to the estate all along. For example, in *Harrison v. Chamberlin*, which was decided well before *Sampsell*, the Supreme Court was asked to consider the lower court's order denying the bankruptcy trustee's effort through a summary proceeding to compel the respondent to deliver to him money in her possession which,

---

*Parkway Calabasas*, 89 B.R. at 837; *Standard Brands Paint*, 154 B.R. at 567.

[30]313 U.S. at 906, 61 S. Ct. at 217.

[31]In contrast, Section 541 now includes as the estate's property only that which the trustee actually recovers from the transferee in connection with what the debtor had previously conveyed and the trustee then has avoided. *Cf.* 11 U.S.C. § 541(a)(3).

he alleged, "was the property of the bankrupt, held by her fraudulently and without color or claim of title." 271 U.S. 191, 192, 46 S. Ct. 467, 468 (1926).

Indeed, it is clear from *Sampsell* that the so-called "consolidation" that the referee in that case had ordered (and that the Court did not then review) was in fact the same type of turnover exercise.

> The referee found, inter alia, that the transfer of the property to the corporation was not in good faith but was made for the purpose of placing the property beyond the reach of Downey's creditors and of retaining for Downey and his family all of the beneficial interest therein; . . . that the corporation was 'nothing but a sham and a cloak' devised by Downey 'for the purpose of preserving and conserving his assets' for the benefit of himself and his family; and that the corporation was formed for the purpose of hindering, delaying and defrauding his creditors. **The referee accordingly ordered that the property of the corporation was property of the bankrupt estate and that it be administered for the benefit of the creditors of the estate.** . . . No appeal from that order was taken.

313 U.S. at 216-17, 61 S. Ct. at 906 (emphasis added).

However, what was of greater interest to the Court in both *Harrison* and *Maggio* was the perennial question of the bankruptcy court's jurisdiction. Under the Act, the debate focused upon whether the matter raised by the bankruptcy trustee was either "summary" or "plenary." For example, in *Harrison*, the transferee contended, and the Court agreed, that she had had a sufficient adverse interest in the contested property so as to oust the bankruptcy court of its summary jurisdiction – i.e., its jurisdiction to administer on behalf of the estate whatever belonged to the debtor at the moment he had filed for relief. As a consequence, the Court in *Harrison* concluded that

13

the bankruptcy court's[32] jurisdiction over the transferee was only plenary and, as such, could not have been exercised without her consent. *Harrison*, 271 U.S. at 195, 46 S. Ct. at 469.[33]

The Court made the same summary/plenary distinction in *Maggio*, albeit it affirmed the turnover order in that instance. In particular, it observed that the turnover procedure was an "innovation" that reflected judicial ingenuity as opposed to anything "expressly created or regulated by the Bankruptcy Act."[34]

> In applying these grants of power, courts of bankruptcy have fashioned the summary turnover procedure as one necessary to accomplish their function of adminstration [sic]. It enables the court summarily to retrieve concealed and diverted assets or secreted books of account the withholding of which, pending the outcome of plenary suits, would intolerably obstruct and delay administration. When supported by 'clear and convincing evidence,' the turnover order has

---

[32]Technically, at the time of *Harrison* and *Maggio* the bankruptcy referee could only recommend the turnover in a report to the district court and it was the district court judge who in fact issued the desired order. However, it is more convenient to refer to a single "bankruptcy court" as issuing the turnover order under the former Act notwithstanding the historical inaccuracy.

[33]*See also Cline v. Kaplan*, where the Court said:

> A bankruptcy court has the power to adjudicate summarily rights and claims to property which is in the actual or constructive possession of the court.
>
> * * *
>
> But the mere assertion of an adverse claim does not oust a court of bankruptcy of its jurisdiction. It has both the power and the duty to examine a claim adverse to the bankrupt estate to the extent of ascertaining whether the claim is ingenuous and substantial. Once it is established that the claim is not colorable nor frivolous, the claimant has the right to have the merits of his claim passed on in a plenary suit and not summarily. Of such a claim the bankruptcy court cannot retain further jurisdiction unless the claimant consents to its adjudication in the bankruptcy court.

323 U.S. 97, 99, 65 S. Ct. 155, 156 (1944) (citations omitted).

[34]333 U.S. at 61, 68 S. Ct. at 404.

14

been sustained as an appropriate and necessary step in enforcing the
Bankruptcy Act.

333 U.S. at 62-63, 68 S. Ct. 401, 405 (citations omitted).

Other "Traditional" Substantive Consolidation Cases

But this court is getting ahead of itself. Returning to the basic notion that a bankruptcy court's jurisdiction under the former Act extended to whatever property belonged to the bankrupt's estate, at least two circuits had unequivocally affirmed before *Sampsell* a lower court's exercise of its summary jurisdiction to seize another corporation's assets. For example, in *Central Republic Bank & Trust Co. v. Caldwell*,[35] the Eighth Circuit affirmed the lower court's order directing a non-debtor subsidiary of a bankrupt utility to turnover all of its assets notwithstanding the objection of one of the subsidiary's creditors.[36] It held that the lower court's exercise of its summary jurisdiction over all of the subsidiary's assets was proper because it was "an agency and instrumentality of the Municipal Telephone & Utilities Company [i.e., the bankrupt utility]." *Id.* at 735.

*Fish v. East*[37] also predates *Sampsell*, albeit by only one year. In *Fish*, the bankruptcy court had exercised its summary jurisdiction to compel the subsidiary of the bankrupt debtor to turnover its property to the estate. In affirming that decision, the court first recognized the propriety of using a summary proceeding to recover property from a non-debtor if that party had only a colorable claim to it. A "[c]orporate entity" it said "may be disregarded where not to do so will defeat public

---

[35]58 F.2d 721 (8th Cir. 1932).

[36]*Central Republic* is somewhat confusing because it uses the word "receiver" as opposed to "trustee" to describe the court-appointed representative. Nonetheless, a bankruptcy proceeding was clearly involved. Apparently, "receiver" was chosen over "trustee" because an order for relief had not yet entered in the involuntary case. *Cf.* 11 U.S.C. § 11(3) (repealed).

[37]114 F.2d 177 (10th Cir. 1940).

15

convenience, justify wrong or protect fraud." *Id.* at 191. It then concluded that the turnover ordered in the case before it was appropriate because the subsidiary was only an instrumentality of the bankrupt debtor and, as such, its claim to its parent's property was "unsubstantial and colorable only." *Id.* at 189.

Another equally significant decision, *Stone v. Eacho (In re Tip Top Tailors, Inc.)*,[38] was issued by the Fourth Circuit a year after *Sampsell*. That case involved a bankrupt Delaware corporation that had operated retail stores in various locations, including one in Richmond, Virginia. The debtor had operated all of the stores in the same manner, with no pretense whatsoever that any particular store, including the Virginia store, was separate or distinct from the overall operation. However, for some unexplained reason, the Virginia store alone was incorporated as a separate subsidiary.

The dispute in *Stone* was precipitated by two creditors attaching the Virginia subsidiary's assets on the theory that those assets were separate from the bankruptcy proceeding and, as such, subject only to the subsidiary's own creditors. The trustee in the Delaware proceeding reacted by filing an involuntary petition in Virginia to place the subsidiary into its own bankruptcy proceeding. The Delaware trustee then filed a claim in that case for what he contended the subsidiary owed to its Delaware parent. However, when a special master determined that the parent's claim should be "postponed" to the claims of the subsidiary's general creditors, the Delaware trustee requested the Virginia bankruptcy court to consolidate the Virginia proceeding into the Delaware proceeding. The Delaware trustee appealed when his request was denied.

---

[38] 127 F.2d 284 (4th Cir. 1942).

16

The Fourth Circuit reversed.  It held:

> There is no reason apparent from the record why all creditors of that corporation should not be treated in exactly the same way; and the fact that it had obtained a charter from the State of Virginia furnishes no good reason why the creditors dealing with its Richmond store should be dealt with differently from its other creditors, since there is no showing that business was done under that charter or that any of the creditors knew anything about it or relied on it in any way. . . . Only by entirely ignoring the separate corporate entity of the Virginia corporation and consolidating the proceedings here with those of the parent corporation in New Jersey can all the creditors receive that equality of treatment which it is the purpose of the bankruptcy act to afford; and this, we think, is the course that should be followed.

*Id.* at 287-88.

Of these earlier, more traditional cases, then, *Stone v. Eacho* is certainly the one most akin to a modern court's notion of substantive consolidation – i.e., a court of bankruptcy ordering the combination of the assets and liabilities of one entity with the assets and liabilities of another. However, *Stone v. Eacho* is an unusual case, for, unlike *Sampsell*, *Central Republic* and *Fish v. East*, which all approached the issue of asset acquisition, if you will, from the perspective of the acquiring party, *Stone v. Eacho* approaches the issue from the opposite perspective.  That is, it was the district court of the targeted entity that had denied the Delaware bankruptcy trustee's effort to take control of that entity's assets, and because the targeted entity was in Virginia, it was the Fourth Circuit, not the Third Circuit, that heard the appeal.

This court submits that this difference in perspective explains the broader language that the Fourth Circuit used to justify its decision to in effect relinquish the Virginia court's jurisdiction over the targeted corporation's property that the Delaware bankruptcy trustee claimed actually belonged to his estate.  In fact, a careful review of *Stone v. Eacho* reveals that the court in that case used the

17

very same legal theories that had been used to order the turnover of another's property in other traditional cases like *Sampsell*, *Central Republic*, and *Fish v. East*. For example, *Stone v. Eacho*, in reaching its decision, references the same "piercing the veil" concepts as did these three prior cases.

> It is well settled that courts will not be blinded by corporate forms nor permit them to be used to defeat public convenience, justify wrong or perpetrate fraud, but will look through the forms and behind the corporate entities involved to deal with the situation as justice may require. Not only is this done for the purpose of holding a stockholder or parent corporation for debts created by an insolvent corporate agent or subsidiary which is a mere instrumentality of the stockholder or parent, but also for the purpose of allowing the creditors of the stockholder or parent to reach assets held by such a subsidiary. And, where the court decides that the corporate entity of the subsidiary should be completely ignored and its assets and liabilities treated as those of the parent corporation, it is both logical and convenient that this be done in one proceeding.

*Id.* at 288-89 (citations omitted).[39]

Moreover, when the Fourth Circuit in *Stone v. Eacho* cited earlier cases as examples of when it was appropriate to disregard the corporate form and combine assets, it cited only those cases, including *Fish v. East*, where the authority to do so had been based upon those courts' summary jurisdiction and the theory that the other entity's property had in fact belonged to the bankruptcy estate all along. Indeed, it was only after the court in *Stone v. Eacho* described the assets of the Virginia subsidiary

---

[39]As noted in *Stone v. Eacho*, alter ego theory typically allows a creditor of a corporation to disregard the limited liability the corporate form provides an individual (i.e., "pierce the corporate veil") in order to still hold the shareholder liable for the corporate debt. However, alter ego theory also will permit a creditor to disregard the corporate form in order to attach the assets of a corporation that is otherwise not liable to it under appropriate circumstances. This latter application of alter ego theory is sometimes referred to as "reverse veil piercing." 18 AM. JUR. 2d *Corporations* § 47 (2010) ("In a reverse piercing case, the assets of the corporate entity are used to satisfy the debts of a corporate insider so that the corporate entity and the individual will be considered one and the same.").

18

as being "unquestionably the assets of the parent corporation"[40] that it then reached the ultimate conclusion that the two proceedings should be consolidated.

In sum, then, this court does not agree with *Owen Corning*'s recent declaration that *Sampsell* represented a "new remedy" or that courts of appeal, with the exception of *Stone v. Eacho*, "were slow to follow suit." 419 F.3d at 206-07 (citations and footnote omitted). To the contrary, *Sampsell* represents a continuum of established legal thinking, as evidenced by *Central Republic* and *Fish v. East* beforehand and *Stone v. Eacho* immediately thereafter, that centered upon a federal court's exercise of its summary jurisdiction over the debtor's property in the context of a bankruptcy proceeding. In fact, what is particularly striking about these early cases is that none of them was written *tabula rasa*. Rather, each was able to find considerable authority to support the conclusion reached. *See Central Republic*, 58 F.2d at 735; *Fish v. East*, 114 F.2d at 191 n. 1; *Stone v. Eacho*, 127 F.2d at 288-89.[41]

---

[40]127 F.2d at 290.

[41]Commentators have for the most part followed the same pattern as the courts in describing substantive consolidation under pre-Code case law. For example, in the frequently cited "*Altered Egos: Deciphering Substantive Consolidation*," 59 U. PITT. L. REV. 381 (1998), Professor Mary Elisabeth Kors observed that early Act cases had relied upon turnover orders to accomplish a trustee's seizure of another entity's property based upon alter ego and other corporate veil piercing theories. In fact, she acknowledged that it was from these early turnover cases that "substantive consolidation would soon emerge." *Id.* at 390-91. Unfortunately, Professor Kors, like so many courts and other commentators, did not pursue any further what in fact had been that evolution. Rather, she simply went on with a similar cursory review of *Kheel* and other later Act cases and a more exhaustive but inevitably inconclusive consideration of the modern decisions before positing how, in her opinion, substantive consolidation cases should now be decided.

However, Kurt A. Mayr's article "*Back to* Butner's *Basic Rule - the Fundamental Flaw of Nondebtor Substantive Consolidation*," does go against the grain by recognizing the significance "property of the estate" played in substantive consolidation cases brought under the former Act. 16 NORTON J. BANKR. L. & PRAC. 1, ART. 4 (2007). His article also raises the obvious question of what is to be the controlling law when alter ego is raised as the basis for a bankruptcy estate's assertion of ownership over property ostensibly held by another. As Mr. Mayr observed:

> Some courts have extended the doctrine of substantive consolidation to
> nondebtor entities. . . . While these decisions have applied the doctrine

Soviero and Other Later "Traditional" Cases

It is also inaccurate to characterize the theories embodied in these older cases as being ultimately replaced by the new, more "liberal" trend of cases referenced in *Vecco Construction*. To the contrary, a steady stream of appellate court decisions based upon these traditional concepts of property of the estate, summary jurisdiction, and one entity being the alter ego or instrumentality of another continued right up to the former Act's replacement by the Bankruptcy Code. For example, in *Todd Bldg. Corp. v. Heller (In re Clark Supply Co.)*, 172 F.2d 248 (7th Cir. 1949), the Seventh Circuit affirmed the lower court's order compelling the turnover of an affiliated non-debtor corporation's assets as a proper exercise of its summary jurisdiction based upon the non-debtor having only a colorable claim due to fraud. *Id.* at 254. *See also Maule Indus., Inc. v. Gerstel*, 232 F.2d 294 (5th Cir. 1956); *In re Plymouth Dyeing Co.*, 323 F.2d 134 (3rd Cir. 1963); *Soviero v. Franklin Nat'l Bank of Long Island*, 328 F.2d 446 (2nd Cir. 1964); *Suhl v. Bumb*, 348 F.2d 869 (9th Cir. 1965); *Lytle v. Porter (In re Cintra Realty Corp.)*, 413 F.2d 302 (2nd Cir. 1969); *Wellston, Oklahoma, Natural Gas Auth. Bondholders v. Nesbitt (In re Eufaula Enterprises, Inc.)*, 565 F.2d 1157 (10th Cir. 1977). Of these later cases, *Soviero* is clearly the most important, for it is *Soviero* that not only is repeatedly cited by Code courts as an important substantive consolidation case under

---

under various circumstances, all of the decisions are based upon the assumption that this federal equity power can be used to expand the scope of "property of the debtor's estate" to include nondebtor assets where the elements of substantive consolidation are satisfied. However, this assumption is fundamentally flawed because it seeks to inflate the debtor's property rights through an equitable power of federal bankruptcy law in violation of the Supreme Court's clear mandate that the "*basic federal rule* is that the state law governs" property interests in bankruptcy.

*Id.* at 1 (footnote omitted).

20

the former Act[42] but is also cited in *Kheel* and in many of the other Act cases[43] that represent the new "liberal" trend of substantive consolidation cases that *Vecco Construction* had observed.

*Soviero* involved a bankrupt corporation that, together with fourteen other non-bankrupt corporations, sold carpeting at retail. Suffice it to say that the two shareholders of this empire did not honor the "separateness" of these many entities in their operation of the same. What had prompted the dispute in *Soviero* was the bankruptcy trustee's attempt to sell assets ostensibly belonging to the other nondebtor companies on the theory that their assets "in fact belonged to the bankrupt." 328 F.2d at 446-47. A bank that had lent money to several of the non-debtor companies objected because it held liens in some of the assets the trustee was targeting. The bank also challenged the bankruptcy referee's ability to summarily adjudicate its interests. It contended that

---

[42]*See, e.g., Wells Fargo Bank v. Sommers (In re Amco Ins.)*, 444 F.3d 690, 696 (5th Cir. 2006); *Owens Corning*, 419 F.3d at 207; *Alexander v. Compton (In re Bonham)*, 229 F.3d 750, 766-77 (9th Cir. 2000); *Reider*, 31 F.3d at 1106; *Augie/Restivo*, 860 F.3d at 518; *Logistics Info. Sys., Inc. v. Braunstein (In re Logistics Info. Sys., Inc.)*, No. CIVA09-40117-GAO, 2010 WL 1342940, at *7 (D. Mass. Mar 31, 2010); *In re E'lite Eyewear Holding, Inc.*, No. 08-41374, 2009 WL 349832, at *3 (Bankr. E.D. Tex. Feb 05, 2009); *Official Comm. of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp. (In re Verestar, Inc.)*, 343 B.R. 444, 462 (Bankr. S.D.N.Y. 2006); *Gray v. O'Neill Props. Group, L.P. (In re Dehon, Inc.)*, No. 02-41045, 2004 WL 2181669, at *3 (Bankr. D. Mass. Sept. 24, 2004); *In re Worldcom, Inc.*, No. 02-13533(AJG), 2003 WL 23861928, at *35 (Bankr. S.D.N.Y. Oct 31, 2003); *Bonham*, 226 B.R. at 76; *Cent. Claims Servs., Inc. v. Eagle-Picher Indus., Inc. (In re Eagle-Picher Indus., Inc.,)*, 192 B.R. 903, 907 (Bankr. S.D. Ohio 1996); *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723, 764 (Bankr. S.D.N.Y. 1992); *Lease-A-Fleet*, 141 B.R. at 874; *In re Murray Indus., Inc.*, 119 B.R. 820, 829 (Bankr. M.D. Fla. 1990); *Munford, Inc. v. TOC Retail, Inc. (In re Munford)*, 115 B.R. 390, 397 (Bankr. N.D. Ga. 1990); *Julien Co.*, 120 B.R. at 934; *In re Crown Mach. & Welding, Inc.*, 100 B.R. 25, 27 (Bankr. D. Mont. 1989); *In re I.R.C.C., Inc.*, 105 B.R. 237, 242, (Bankr. S.D.N.Y. 1989); *In re Donut Queen, Ltd.*, 41 B.R. 706, 709 (Bankr. E.D.N.Y. 1984); *Stop & Go*, 49 B.R. at 747; *DRW Property*, 54 B.R. at 495; *In re Crabtree*, 39 B.R. 718, 723 (Bankr. E.D. Tenn. 1984); *Snider Bros.*, 18 B.R. at 234; *In re Richton Int'l Corp.*, 12 B.R. 555, 558 (Bankr. S.D.N.Y. 1981).

[43]*See, e.g., Kheel*, 369 F.2d at 847; *Continental Vending Mach.*, 517 F.2d at 1000; *Cintra Realty*, 413 F.2d at 303; *Pemberton v. Davis*, 403 F.2d 515, 519 (9th Cir. 1968); *Commercial Envelope*, 1977 WL 182366, at *3; *British Columbia Inv. Co. v. FDIC.*, 420 F. Supp. 1217, 1225 (S.D. Cal. 1976); *D.H. Overmyer*, 1976 WL 168421, at *7; *In re Security Prod. Co.*, 310 F. Supp. 110, 116 (E.D. Mo. 1969); *In re Ira Haupt & Co.*, 289 F. Supp. 966, 972 (S.D.N.Y. 1968); *In re Seatrade Corp.*, 255 F.Supp. 696, 699 (S.D.N.Y. 1966); *Food Fair*, 10 B.R. at 126; *In re Barnett*, 5 B.R. 525, 526 (Bankr. D. N.M. 1980); *Vecco Const.*, 4 B.R. at 409; *A & I Realty Corp. v. Kent Dry Cleaners, Inc.*, 307 N.Y.S.2d 99, 101 (N.Y. 1969).

21

a plenary action was required. The referee had overruled the bank's objections based upon his findings that all of the assets, in reality, belonged to the bankrupt debtor and, as such, a turnover order based upon the court's summary jurisdiction was appropriate. The district court thereafter confirmed these findings and the bank then filed its appeal with the Second Circuit.

The question that *Soviero* first addressed was "whether the court properly exercised summary jurisdiction or whether a plenary suit was necessary." *Id.* at 447. It observed that:

> Where the trustee does not have actual physical possession, as in the case at bar, jurisdiction turns on constructive possession. The bankrupt and, consequently, the court, is deemed to have constructive possession where at the time of the filing of the petition in bankruptcy the property in question is held by one whose adverse claim lacks substance and is at best only colorable.
>
> * * *
>
> On this appeal we must determine whether the adverse claims of corporate separateness presented such a fair doubt or a reasonable controversy as to render the Referee's order piercing the corporate entities unjustified.

*Id.* (citations omitted).

*Soviero* then offered this explanation as to why the referee's turnover order was appropriate:

> It is difficult to imagine a better example of commingling of assets and functions and of the flagrant disregard of corporate forms than as here demonstrated by the bankrupt. One gains the distinct impression that the bankrupt held up the veils of the fourteen collateral corporations primarily, if not solely, for the benefit of the tax gatherer, but otherwise completely disregarded them. Even Salome's [veil] could not have been more diaphanous. On these facts, we are convinced that the claims of individual corporate entities advanced for the Affiliates and Realty are 'without color of merit, and a mere pretense.'

*Id.* at 448 (citations omitted).

22

But what *Soviero* said next is even more important, for it went on to address "the propriety of the turnover order" that the lower court had entered in that instance and, by implication, the propriety of the very same turnover orders that other courts had traditionally entered under the former Act in so-called substantive consolidation cases, beginning with *Central Republic* and *Fish v. East* and continuing with *Suhl, Cintra Realty, Maule Industries, Clark Supply,* and *Eufaula Enterprises.*[44] This is what *Soviero* said:

> A turnover order is 'a judicial innovation by which the court (of bankruptcy) seeks efficiently and expeditiously to accomplish ends prescribed by the statute.' *Maggio v. Zeitz,* 333 U.S. 56, 61, 68 S.Ct. 401, 92 L.Ed. 476 (1948). We cannot agree with the Bank's contention that the corporate veils may be pierced only where the Referee finds that the subsidiary corporations were organized to defraud or hinder creditors. *Cf.* Bankruptcy Act, § 67(d) 11 U.S.C.A. § 107(d). Contra, *Maule Industries Inc. v. Gerstel,* 232 F.2d 294 (5th Cir. 1956). In *Stone v. Eacho,* 127 F.2d 284 (4th Cir.), cert. denied, 317 U.S. 635, 63 S.Ct. 54, 87 L.Ed. 512 (1942), where the facts closely resembled those of the instant case, the court affirmed the issuance of the turnover order, ignoring the corporate entity of a subsidiary corporation, for only then could 'all the creditors receive that equality of treatment which it is the purpose of the bankruptcy act to afford.' 127 F.2d at 288. A similar conclusion is fully warranted here.

*Id.* at 448-49.

It is *Soviero,* then, that provides in a comprehensive opinion a textbook example of what had become a well established practice under the former Act of courts in bankruptcy permitting the involuntary seizure of another entity's assets through the issuance of a turnover order so long as the

---

[44]The trustee in *Sampsell* had asked the bankruptcy referee to marshal the non-debtor's assets for the benefit of the bankrupt's creditors as opposed to their turnover. However, it is fair to say that "marshalling" and "turnover" were interchangeable in describing the relief sought given that turnover orders and marshalling orders would have been in any event a judicial innovation under the former Act. *See Maggio,* 333 U.S. at 61, 68 S. Ct. at 404.

bankruptcy trustee could establish that the targeted entity was merely the alter ego or instrumentality of the bankrupt debtor. Moreover, *Soviero* establishes without question that this accepted exercise of combining another entity's assets with those of the bankruptcy estate's was premised upon the Supreme Court's prior recognition in *Maggio* that the turnover order utilized was an appropriate "judicial innovation" under the Act to accomplish the intended consolidation.

Section 542 Turnover Orders

Why this latter point in *Soviero* is so important is that a turnover order is no longer an innovation under the Bankruptcy Code. Rather, what had been only an innovation under the Act is now incorporated into Section 542. Specifically, subpart (a) provides that:

> Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

The Supreme Court itself had the opportunity to address the addition of Section 542 to the Bankruptcy Code early on in *U.S. v. Whiting Pools, Inc.*, 462 U.S. 198, 103 S. Ct. 2309 (1983). Granted, *Whiting Pools* involved the turnover of property belonging to the debtor that had been repossessed by a secured creditor. Nonetheless, the Court recognized in *Whiting Pools* both the broad scope of Section 541(a)(1)'s reach[45] and the trustee's authority under the newly enacted Section 542 to take control of all of the estate's property, even if in the possession of another.[46] Moreover, it acknowledged Section 542 as reflecting the Code's abolishment of the summary-

---

[45]*Id.* at 204-05, 103 S. Ct. at 2313-14.

[46]*Id.* at 205-06, 103 S. Ct. at 2314.

24

plenary jurisdictional dichotomy that had plagued turnover proceedings under the former Act.[47]

Indeed, the Court pointed out in *Whiting* that Section 542(a) would be "largely superfluous" in light

of the already broad scope of Section 541(a)(1) were it not for Section 542(a)'s broader authority to

reach out and take control of the estate's property in the possession of others.[48]

Later courts have been even more specific as to the importance of Section 542(a)'s addition

to the Bankruptcy Code. As Bankruptcy Judge Grant observed in *Boyer v. Davis (In re U.S.A.*

*Diversified Prods., Inc.*:

> Beyond the abolition of the distinction between summary and plenary
> jurisdiction, turnover proceeds can no longer be characterized as "a
> judicial innovation." *Maggio*, 333 U.S. at 60-62, 68 S.Ct. at 404.
> They now have a statutory foundation [i.e., Section 542], which
> delineates not only the elements of the trustee's burden of proof but
> also the remedies available to it.

193 B.R. 868, 878 (Bankr. N.D. Ind. 1995) *aff'd*, 110 F.3d 53 (7th Cir. 1996).[49]

The *U.S.A. Diversified* court then went on to hold that even a person who had been in possession of

the estate's property but who no longer held it could still be held accountable under Section 542's

provisions.

The Supreme Court has repeatedly stated that the Bankruptcy Code is not to be read as if

written on a clean slate. To the contrary, the Code is to be interpreted in a manner consistent with

prior bankruptcy practice unless Congress has expressly indicated otherwise. *Hamilton v. Lanning*,

---

[47]*Id.* at 206 n. 13, 103 S. Ct. at 2314 n.13.

[48]*Id.* at 206-07 nn. 13, 15, 103 S. Ct. 2314-15 nn. 13, 15.

[49]*See also Bailey v. Suhar (In re Bailey)*, 380 B.R. 486, 491-93 (B.A.P. 6th Cir. 2008); *Thomas v. Burke (In re Burke)*, 150 B.R. 660, 663 (Bankr. E.D. Tex. 1993); *In re Gentry*, 275 B.R. 747, 750 (Bankr. W.D. Va. 2001); *Greene v. Schmukler (In re De Berry)*, 59 B.R 891, 895-96 (Bankr. E.D.N.Y. 1986).

No. 08-998, 2010 WL 2243704, at *7 (U.S. June 7, 2010); *Travelers Cas. & Sur. Co. of Am. v. Pacific Gas & Elec. Co.*, 549 U.S. 443, 454, 127 S. Ct. 1199, 1206-07 (2007); *Lamie v. U.S. Trustee*, 540 U.S. 526, 539, 124 S. Ct. 1023, 1033 (2004); *Cohen v. de la Cruz*, 523 U.S. 213, 221, 118 S. Ct. 1212, 1218 (1998); *Dewsnup v. Timm*, 502 U.S. 410, 419, 112 S. Ct. 773, 779 (1992); *Pennsylvania Dept. of Public Welfare v. Davenport*, 495 U.S. 552, 563, 110 S. Ct. 2126, 2133 (1990); *Midatlantic Nat'l Bank v. New Jersey Dept. of Envtl. Prot.*, 474 U.S. 494, 501, 106 S. Ct. 755, 759-60 (1986). The question, of course, is whether modern courts, in their reliance upon equity as opposed to the Code, have honored this interpretational rule in considering more recent requests for substantive consolidation. After all, there was clearly a well established procedure under the former Act for "consolidating" another entity's assets with those of the estate and that procedure was grounded upon bankruptcy principles, not equity – to wit, that a court, in the exercise of its summary jurisdiction over the debtor's property, could compel another entity to turnover assets to the estate if that entity was merely the bankrupt's agent, instrumentality, or alter ego. Moreover, while a court's ability to order such a turnover was only a judicial innovation under the former Act, it is now specifically authorized in Section 542 of the Code. Does not, then, *Lanning, Pacific Gas, Lamie, Cohen, Dewsnup, Davenport,* and *Midatlantic* all require courts today to look to Section 542, not Section 105, as the authoritative source for considering whether another entity's assets should be seized on the pretext that the estate and the targeted entity are to be treated as one?[50]

---

[50]*Pepper v. Litton*, 308 U.S. 295, 60 S. Ct. 238 (1939) is also cited from time to time as authority for ordering substantive consolidation. *See, e.g., In re Cooper*, 147 B.R. 678, 681 (Bankr. D. N.J. 1992). However, the specific issue in *Pepper v. Litton* was whether the secured claim of a dominant shareholder could be subordinated to the claims of other creditors against the estate. Moreover, while the subordination ordered under *Pepper* at that time was also just another judicial innovation derived from the general bankruptcy principles underlying the former Act, *Pepper's* innovation has now been incorporated in the Bankruptcy Code as Section 510, just as *Maggio's* innovation is now incorporated in Section 542.

26

Indeed, reliance upon equity as an alternative to Section 542 flies in the face of the other oft repeated admonition that "whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code." *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206, 108 S. Ct. 963, 969 (1988). *See also Mitan v. Duval (In re Mitan)*, 573 F.3d 237, 243 (6th Cir. 2009); *Solow v. Kalikow (In re Kalikow)*, 602 F.3d 82, 96-97 (2nd Cir. 2010); *HSBC Bank USA v. Branch (In re Bank of New England Corp.)*, 364 F.3d 355, 362 (1st Cir. 2004). As Professor Baird[51] has observed:

> A debate over different approaches to substantive consolidation, however, should not obscure a more fundamental problem. One cannot be sure that an appellate court would allow substantive consolidation at all, particularly given that the Supreme Court has never adopted it. Far from providing a basis for substantive consolidation, cases such as *Sampsell* rely explicitly on fraudulent conveyance doctrine and thus underscore the need to find an explicit grant of power somewhere.
>
> * * *
>
> The absence of any clear statutory authority in the Bankruptcy Code throws into question the viability of the doctrine in an appellate court that focuses on the language of the Bankruptcy Code and refuses to look beyond it. Substantive consolidation is, as the term suggests, a *substantive* power. In the view of some courts, substantive powers such as this are permitted only to the extent that they grow out of substantive provisions of the Bankruptcy Code. Courts have stated again and again that substantive powers cannot be derived from section 105 of the Bankruptcy Code.

*Substantive Consolidation Today*, 47 B.C. L. REV. 5, 19 (Dec. 2005) (emphasis in original).

Equitable Allowance of Claims Under Section 502(j)

Of course, Section 542 answers only one part of the equation – how and when can a targeted entity's assets become part of the bankruptcy estate. That section, though, does not address the

---

[51]Douglas G. Baird, Harry A. Bigelow Distinguished Professor of Law, University of Chicago.

separate question of what is to be done with the creditors of the targeted entity. Equity at the very least suggests that some provision should be made for such creditors, especially in those instances when it was the notion that the targeted entity and the bankrupt debtor were one in the same that had prompted the recovery in the first place.

Courts under the former Act clearly afforded these creditors relief. For example, *Sampsell* itself not only permitted a creditor who was actually complicit in the debtor's scheme to still share *pari passu* with the estate's other creditors, but *Sampsell* also approved, at least implicitly, the lower court's decision to actually give priority to those creditors of the targeted corporation who had dealt with it in good faith.

However, it must be remembered that *Sampsell* involved the recovery of a fraudulent transfer. Why this is important is that Section 550 now governs the recovery of such transfers and Section 550 is silent concerning how the unsecured creditors of a targeted entity are to be treated in the event a recovery of property is ordered.[52] Nor is there any provision in Section 542 to address such creditors should that section be used to seize another's property based upon some alter ego theory. Does this mean, then, that courts under the Bankruptcy Code are to be indifferent to the negative impact these sections can have upon innocent creditors of an entity that has been successfully stripped of its assets by a bankruptcy estate?

---

[52]In contrast, a secured creditor of a targeted entity is covered because the attachment of that creditor's lien to the subject property would be deemed a subsequent transfer. *Cf.* 11 U.S.C. § 550(b)(1). However, whether the secured creditor could in fact preserve its lien against a trustee's Section 550 challenge would depend upon whether the lien was taken in good faith, for value, and without knowledge that the initial transfer was avoidable. *Id.*

28

The answer is no, for Section 502(j) offers relief. That section, in pertinent part, provides:

> A claim that has been allowed or disallowed may be reconsidered for cause. A reconsidered claim may be allowed or disallowed **according to the equities of the case. . . .**

(Emphasis added).

In other words, a creditor of an entity successfully targeted under applicable law concerning instrumentalities and alter egos may or may not have under that same law a cognizable claim against the prevailing party. However, if it does not, Section 502(j) would nonetheless permit that creditor a claim if the equities permitted it, which would certainly seem to be the case whenever there has been a wholesale seizure by the bankruptcy estate of another entity's assets on the theory that the two were in fact one in the same all along.[53]

---

[53]Section 502(j), as originally enacted was much more succinct. It stated:

> Before a case is closed, a claim that has been allowed may be reconsidered for cause, and reallowed or disallowed according to the equities of the case.

Bankruptcy Reform Act of 1978, 11 U.S.C. § 502(j) (repealed). That language was similar to what had been its counterpart under the former Act:

> Claims which have been allowed may be reconsidered for cause and reallowed or rejected in whole or in part according to the equities of the case, before but not after the estate has been closed.

Bankruptcy Act of 1898, amended 1938, 11 U.S.C. § 93(k) (repealed).

Of course, the current iteration of Section 502(j), which is the result of Congress' 1984 amendments to the Code, is different from both of these sections because it addresses claims that have been initially disallowed as well as allowed, whereas these earlier sections addressed only claims that were initially allowed. But the former Act had another section that also addressed the reconsideration of claims. It permitted courts of bankruptcy to:

> Allow claims, disallow claims, **reconsider allowed or disallowed claims**, and allow or disallow them against bankruptcy estates.

Bankruptcy Act of 1898, amended 1952, 11 U.S.C. § 11(a)(2) (repealed).

Perhaps to some the application of Section 502(j) in this fashion seems contrived. However, this court routinely uses this same section to deal with the troublesome problem of claims that have been filed late due to lack of notice. As with the innocent creditors of a gutted transferee, logic and fairness suggest that such a tardy claim should still be allowed. Yet, Section 502(b)(9) leaves no room for leniency – if an objection is made, then, notice or not, the tardy claim must be disallowed. However, Section 502(j) in turn permits the court to re-allow, if you will, that claim should in fact it appear that justice so requires.[54]

Combining Sections 542(a) and 502(j) to Accomplish a "Substantive Consolidation"

In summary, this court concludes that what today is conveniently described as a substantive consolidation – i.e., a judicially compelled combination of another entity's assets with those of the bankruptcy estate and the attendant reconciliation of whatever new claims are made against the estate as a consequence of that combination – is nothing more than shorthand for a long recognized process that finds its roots in a bankruptcy court's application of its traditional summary jurisdiction over all

---

Moreover, that subsection, together with that section's other subsections, was prefaced by the recognition that the court would be exercising its authority both at law and in equity. *Id. See also Pepper v. Litton*, 308 U.S. at 305 ("By reason of the express provisions of s 2 these equitable powers are to be exercised in the allowance of claims, a conclusion that is fortified by s 57, sub. k, 11 U.S.C.A. s 93 sub. k.").

This second provision of the former Act does not have a counterpart in the Code. Therefore, while there is no apparent legislative history explaining the 1984 amendment to Section 502(j), it is fair to surmise that the amendment's purpose was to correct this omission by incorporating these two separate former Act provisions into a new and expanded Section 502(j). *See also* 4 *Collier on Bankruptcy*, ¶ 502.LH. [11] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2010).

[54]Some may see an eerie similarity between ultimately allowing a claim or not based upon the equities and substantively consolidating two cases or not based upon the equities. The difference, of course, is that the Bankruptcy Code expressly provides for the former whereas the Bankruptcy Code is silent as to the latter.

of the estate's property.[55]  This court further concludes that these so-called "consolidations" are now

to be accomplished through the application of actual Code sections – to wit, Sections 542(a) and

502(j) – as opposed to through amorphous notions of equity and dubious interpretations of Section

105.[56]

---

[55]This court is not the only one to make this connection.  For example, in *Munford, Inc. v. TOC Retail, Inc. (In re Munford, Inc.)*, the court said:

> Substantive consolidation is essentially a complex turnover proceeding because the debtor is asking the nondebtor affiliated entity to bring into the estate assets in which the debtor asserts an unseparable interest.

115 B.R. 390, 398 (Bankr. N.D. Ga. 1990).

Similarly, the court in *Simon v. Brentwood Tavern, LLC (In re Brentwood Golf Club, LLC)* concluded:

> Because Tavern is the alter-ego of Debtor, this Court is piercing Tavern's corporate veil.  Once Tavern's corporate veil is pierced, there is no need for a determination that the entities need to be substantively consolidated because the assets and operations of one are, as a matter of law, the assets and operations of the other and, thus any alleged assets of Tavern are property of the estate.

329 B.R. 802, 811 (Bankr. E.D. Mich. 2005).  *See also Luper v. Banner Indus., Inc. (In re Lee Way Holding Co.)*, 105 B.R. 404, 412 (Bankr. S.D. Ohio 1989).

[56]Huntington had filed a motion in limine shortly before trial that required this court to also consider at that time the theoretical underpinnings of substantive consolidation.  The issue was raised because the trustee contended that the equitable roots of substantive consolidation permitted her to raise unclean hands as a defense to Huntington's motions.  Indeed, it was that defense, together with the good faith arguments being raised by Huntington in connection with Trustee Meoli's fraudulent transfer action against it, that prompted the consolidated trial.

This court granted Huntington's motion to eliminate the unclean hands defense and to otherwise bar consideration of Huntington's own conduct in connection with its substantive consolidation motions.  In doing so, the undersigned judge did reference Section 105(a) as a source for a court's authority to order substantive consolidation.  However, that observation was made in the broader context of concluding that if a bankruptcy court has any such authority, then it must derive from the Bankruptcy Code, not from general principles of equity that stand apart from the Code.  Moreover, this court has since had the benefit of significantly more research and reflection and, as a consequence, has no reservation in now refining its conclusion as to where so-called substantive consolidation fits within the Bankruptcy Code.  In fact, the court, in its prior decision granting Huntington's motion in limine, pondered over Huntington's standing to

31

Indeed, even describing this phenomenon as a consolidation is a misnomer, for "consolidation" suggests an actual merger of the two entities as opposed to simply the rearrangement of the entities' assets and liabilities. This court can certainly understand why one might think of the targeted entity being merged into the prevailing estate when each is a corporation or some other legal fiction to begin with. However, what if the estate's target were a natural person? In other words, what if the trustee of a corporate debtor were to set his sights on an individual shareholder who had used the corporation to segregate his liabilities from his assets? It would, of course, be absurd to treat the individual as having become one with the bankruptcy estate through a merger.[57] The better

---

bring the motion and, as will be seen, it is Huntington's lack of standing that ultimately causes its motions to fail.

[57]In *Lease-A-Fleet*, the court raised similar questions as to exactly what is the effect of a substantive consolidation:

> It is not even clear exactly what of Robins would actually be consolidated with the Debtor's case if the relief sought by Lauderhill were granted to it. Lauderhill's Complaint does not clarify this mystery, as it merely requests that the court "substantively consolidate" Robins and the Debtor. We therefore query: if this relief were granted, would Robins then have a bankruptcy "case" or would it arrive in this court, in some other form, as a non-debtor somehow attached to the Debtor's case? It seems to this court that it is cruel and unusual, among other things, for an entity to be in some way appended as a party to a debtor's case, but to not have the benefit of the automatic stay, avoidance powers, or the right to formulate a plan of reorganization, as does any debtor.

141 B.R. at 874.

And, in *Standard Brands Paint*, the court observed:

> Caselaw is vague as to what exactly happens to corporate form in substantive consolidation. It appears from reviewing the caselaw and legal periodicals that most courts, parties, and commentators have not focused

32

approach on such an occasion, as it should be on all occasions when a so-called consolidation is

sought, is to view the effort as actually a process that involves specific Code sections that, when

applied, result not in the merger of entities, but rather in nothing more than the realignment of assets

and liabilities within the affected group.[58]

---

> on this issue. . . . Nor is there a generally accepted accounting principal
> governing substantive consolidation in bankruptcy.

154 B.R. at 569 (footnote omitted).

[58]Recasting substantive consolidation in this fashion also provides more clarity as to when such involuntary acquisitions are to be permitted. If the question is ultimately one of whether another entity's property is in fact the estate's, then *Butner v. U.S.* teaches that the court is to look to state law for the answer unless the Bankruptcy Court provides otherwise.

> Property interests are created and defined by state law. Unless some
> federal interest requires a different result, there is no reason why such
> interests should be analyzed differently simply because an interested party
> is involved in a bankruptcy proceeding.

440 U.S. 48, 55, 99 S. Ct. 914, 918 (1979).

Consequently, it would appear that a particular state's laws concerning when the corporate fiction of separateness can be disregarded as it relates to the question of ownership is extremely relevant to when an involuntary "consolidation" is to take place. *See also* Mayr, *supra* note 41.

Consideration of applicable state law in turn leads to the question of whether the bankruptcy estate itself has standing to recover another entity's property on an alter ego theory. As the court observed in *Goldman v. Haverstraw Assoc. (In re R.H.N. Realty Corp.)*, "[t]he corporate veil is never pierced for the benefit of the corporate debtor." 84 B.R. 356, 360 (Bankr. S.D.N.Y. 1988). Nonetheless, other courts have found the trustee to have standing in the estate's own right or under Section 544.

> Whether the trustee is representing the estate or "standing in the shoes" of
> the creditors, he has the duty to marshal the debtor's property for the
> benefit of the estate, and thus the right to sue parties for recovery of all
> property available under state law.

*Koch Refining v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1343 (7th Cir. 1987). *See also Luper v. Banner Indus., Inc. (In re Lee Way Holding Co.)*, 105 B.R. 404, 411 (Bankr. S.D. Ohio 1989); *St. Paul Fire and Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 700 (2nd Cir. 1989); *Ginger Root Office Assoc., LLC v. Farmer (In re Advanced Packaging and Prods. Co.)*, 426 B.R. 806, 818-19 (C.D. Cal. 2010).

33

Reconciling *Kheel* and Other "Liberal Trend" Cases

As already noted, *Vecco Construction* has tabbed more recent Act cases as representing a "liberal trend in allowing consolidation" with its

> greater emphasis on the interaction of the corporate group and the economic benefit to creditors in a consolidation proceeding, as opposed to the requirements enunciated in earlier cases that each of the corporations have the identical creditors or that corporate formalities were so thinly veiled that creditors tended to rely upon the group for payment rather than a single corporation.

4 B.R. at 409.

If, then *Vecco Construction* is to be believed, cases like *Kheel* and *Flora Mir*, both of which are cited as exemplifying this liberal trend, arguably provide the historical justification for departing from the more traditional trend of cases represented by earlier cases such as *Central Republic*, *Fish v. East*, and *Stone v. Eacho*.

However, *Vecco Construction* is misleading because it suggests that all courts, when confronted with substantive consolidation in the 1960s and 1970s, had opted to abandon the legal theories that their predecessors had relied upon when considering such requests and had instead adopted a newer, more utilitarian approach. But, as already discussed, *Soviero*, *Suhl*, *Cintra Realty*, and *Eufaula Enterprises* were also decided during the same time frame as *Kheel* and *Flora Mir* and all of these cases continued to apply the same "traditional" concepts that earlier courts, including *Sampsell*, had been applying for some time. Indeed, the prominence that *Soviero* plays in *Vecco Construction*'s own analysis calls into question just how careful that court had been in evaluating the relevant case law before declaring that something new was afoot.

34

Specifically, what *Vecco Construction* missed is that in each of the cases it singled out, the entities involved were all bankruptcy estates and that all of the trustees or debtors-in-possession of those estates were amenable to the consolidation proposed. For example, in *Kheel*, the bankruptcy trustees of eight related bankruptcy estates had joined with the United States to request from the court an order whereby "the assets of all debtors are treated as common assets and claims of outside creditors against any of the debtors are treated as against the common fund . . . ."[59] However, a creditor of one of the estates opposed this attempt to "consolidate" the cases because it feared that it would receive a lesser distribution if the estates were combined than it would receive if the estates and their respective creditors were kept separate. Likewise, in *Flora Mir*, the parent corporation and twelve of its subsidiaries filed motions to consolidate all of their cases on the same day as they filed their Chapter XI petitions over the vigorous opposition of one of the subsidiary's debenture holders. 432 F.2d at 1061-62.

This distinction is very important. Consider, for example, an entity that the bankruptcy trustee has targeted with a turnover proceeding based upon the theory that it was the instrumentality of the bankrupt debtor. The targeted entity could certainly risk losing all of its assets to the estate by fighting. Therefore, would it not be sensible for that entity to consider forgoing that risk by surrendering, say, half of its assets to the estate? Or, perhaps the surrender of all of its assets might be a viable alternative to fighting were the estate to also agree to permit all of the targeted entity's creditors to participate as additional claimants of the estate.

If, though, settlement is an option to all-or-nothing resistence to this type of proceeding, is not the same option available when the targeted entity is another bankruptcy estate instead of, say,

---

[59]369 F.2d at 847.

35

a non-debtor corporation? It may seem strange to include bankruptcy estates among the entities that may be the object of a Section 542 turnover order. If, though, as case law instructs, a bankruptcy estate can gain no greater rights in property than those held by the debtor,[60] it certainly would seem to follow that a bankruptcy estate would be no more immune to a turnover proceeding commenced by another bankruptcy estate than would the targeted debtor itself have been immune had it not been placed in bankruptcy. As such, a targeted bankruptcy estate would also presumably be faced with the same fight-or-settle decision were its property ever to become the object of another estate's turnover motion.[61]

The point is that voluntary consolidations like the ones in *Kheel* and *Flora Mir* are more properly viewed as negotiated settlements of what otherwise could have been a hostile attempt by one or even both bankruptcy estates to take control of the other's assets through a turnover proceeding. A bankruptcy court's evaluation of a settlement, though, is different from a bankruptcy court's own consideration of whatever may have been in dispute. Granted, courts under the former Act might not have cared much whether the consolidation order being sought was the product of an

---

[60]*Butner*, 440 U.S. at 55, 99 S. Ct. at 918. In a much earlier opinion, the Supreme Court also expressed the same sentiment, albeit in a quainter fashion. "Under the present bankruptcy act, the trustee takes the property of the bankrupt . . . in the same plight and condition that the bankrupt himself held it . . . ." *Thompson v. Fairbanks*, 196 U.S. 516, 526, 25 S. Ct. 306, 310 (1905). *See also Demczyk v. Mutual Life Ins. Co. of New York (In re Graham Square, Inc.)*, 126 F.3d 823, 831 (6th Cir. 1997); *Rogan v. Bank One, Nat'l Ass'n (In re Cook)*, 457 F.3d 561, 566 (6th Cir. 2006); *Spradlin v. Jarvis (In re Tri-City Turf Club, Inc.)*, 323 F.3d 439, 443-44 (6th Cir. 2003).

[61]The trustee of a corporate bankruptcy estate was in fact pitted against the trustee of the individual shareholder's estate in *Lewellyn*, with the former seeking the substantive consolidation of the two and the latter seeking only joint administration. 26 B.R. at 247. The court in that instance ordered the two cases to be consolidated. However, it is not clear whether the court actually merged the two estates and which of the two estates survived if it did order a merger.

agreement or an adversarial proceeding since courts back then involved themselves in any event in virtually every decision the trustee made.

However, case administration under the Bankruptcy Code is based upon trustee empowerment, not court orders.[62] It is the trustee, as opposed to the court, who is charged with acting on behalf of the estate, with the court intervening only in those instances where the Code requires its involvement. For example, a trustee requires no order from the bankruptcy court to sell property of the estate provided that the disposition is in the ordinary course of the debtor's business. 11 U.S.C. § 363(c). On the other hand, if the proposed sale is outside the ordinary course, the transaction may need a court order, but even then only if a party objects or the trustee specifically requests one.[63]

Therefore, asking whether a modern bankruptcy court should or should not order a voluntary consolidation proposed by the trustees or debtors-in-possession of two or more estates is an anachronism of an earlier time. The appropriate questions to ask today are: (1) whether the Code itself prohibits the trustee or debtor-in-possession from even agreeing to "consolidate" the estates; and (2) if consolidation is not altogether prohibited, whether a particular Code section nonetheless requires the court to review what is proposed before the trustee or debtor-in-possession can actually proceed.

---

[62]*In re Engman*, 395 B.R. 610, 621 (Bankr. W.D. Mich. 2008).

[63]As an alternative, a trustee may procure the necessary authority by notifying the creditor matrix of his intention to sell and then relying upon no timely response being made. *Cf.* 11 U.S.C. § 102(1)(A). *See also In re Engman*, 395 B.R. at 622 (discussing discretionary and conditional authority of the trustee in the context of Sections 363(b) and (c)).

The Bankruptcy Code is unequivocal that a separate, legally recognizable entity – i.e., a bankruptcy estate – is created whenever a bankruptcy case is filed.  11 U.S.C. § 541(a).  Yet the Code is strangely quiet as to when, if ever, that estate ceases to exist.  Indeed, Section 554(d) provides that unadministered property shall remain with an estate even after a case is closed.  It would seem, then, that all estates, at least in theory, continue into eternity, since one can never be quite sure that all of an estate's assets have been administered at close short of the trustee actually abandoning at that time all undisclosed property as well, which is unlikely.  Therefore, it does not just follow that a court, exercising powers that at best arise only from Section 105 and vague references to equity, can eliminate such an otherwise resilient entity through what in effect is an ordered merger of two bankruptcy estates into one.  To the contrary, Section 302(b) seems to provide that the only time a court is capable of accomplishing such a feat is when the two estates involve a husband and wife, and then only when a joint petition has been filed.[64]

However, for the reasons given, this court does not view substantive consolidation as an actual merger of two estates into one.  Rather, it views consolidation as nothing more than shorthand for a less extreme process that almost inevitably begins with at least one bankruptcy estate vying

_____

[64]This court again acknowledges that Section 1123(a)(5)(C) also contemplates consolidations.

> (a) [A Chapter 11] plan shall—
> * * *
> (5) provide adequate means for the plan's implementation, such as—
> * * *
> (C) merger or consolidation of the debtor with one or more persons;

However, a debtor is not the same as the bankruptcy estate.  *Cf.* 11 U.S.C. §§ 101(13) and 541(a).  Nor does the term "person" include a bankruptcy estate.  *Cf.* 11 U.S.C. §§ 101(15) and (41).  Therefore, the consolidation envisioned by this section would seem to be only one that would take place post-confirmation, and then only in conjunction with the debtor's property first being removed from the bankruptcy estate.

under Section 542 for the property of another.[65]    Consequently, what would appear to be a

prohibition under the Bankruptcy Code against the outright merger of two estates is not a concern.

In other words, if under Section 542 a dispute can arise between two or more bankruptcy estates as

to whether one debtor's property belonged to another based upon some alter ego-type theory, it

certainly stands to reason that the same dispute, like any other disagreement involving a bankruptcy

estate, can be resolved.  Of course, trustee settlements are not only permitted under the Bankruptcy

Code, they are favored.  *Hicks, Muse & Co., Inc. v. Brandt (In re Heathco Int'l, Inc.)*, 136 F.3d 45,

50 (1st Cir. 1998); *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3rd Cir. 1996); 10 *Collier on*

*Bankruptcy* ¶ 9019.01 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2009).  Therefore,

whenever an order is sought by two or more trustees or debtors-in-possession to voluntarily

"consolidate," if you will, their respective bankruptcy estates, the court's focus should not be on

whether the Bankruptcy Code prohibits the same.  Rather, the court should ask whether it should

even involve itself in what otherwise has been agreed upon among all of the affected estate's

---

[65]This court qualifies its statement with "almost" because instances may arise where the facts are not sufficient to warrant a determination that one entity was the alter ego or instrumentality of the other but where there are still administrative reasons why the assets and liabilities of the two estates should be combined.  For example, two related companies may have been operated separately but the record-keeping was so poor and their affairs so interconnected that advantages still could be had from consolidating the two.

However, the unavailability of Section 542 to permit one or both estates to compel the other to effect the desired consolidation does not mean that the two estates could not otherwise voluntarily attempt the combination to accomplish the desired result.  For example, the court in *Commercial Envelope* was persuaded that the voluntary consolidation contemplated by the four bankruptcy estates there was appropriate given the difficulty of isolating and ascertaining the assets and the liabilities of the individual debtors and the astronomical cost of performing an audit even if such an attempt were made.  1977 WL 182366 at *2.

Of course, the creditors of the respective estates would have the opportunity under either Section 363(b) or Rule 9019(a) (*see infra*) to oppose the proposed consolidation and, indeed, it is fair to say that the court of appeals and the district court in *Flora Mir* heeded those very objections when they both rejected what appeared to them to be a friendly consolidation of those related entities for the purpose of gaining only procedural convenience.  432 F.2d at 1062-63.

39

representatives as an acceptable resolution of what could have been very expensive and risky litigation.

Many courts require all settlements reached by a bankruptcy trustee to be approved pursuant to FED. R. BANKR. P. 9019(a).[66] These courts, then, would presumably conclude that any agreed upon substantive consolidation among estates would necessarily mandate approval from each court having jurisdiction over the estates involved.

As for this court, Rule 9019(a) would not impose such an impediment since this court is of the opinion that approval of settlements under that rule is left to the trustee's discretion.[67] However, as this court has also determined, other Code sections may be involved when a trustee proposes a settlement and those other sections may require court involvement even though a settlement in and of itself would not.[68] In this instance, Section 363(b) prohibits a trustee from not only "selling" or "leasing" estate property outside of the ordinary course, but also prohibits any "use" of that property outside of the ordinary course. Given that a voluntary "consolidation" of two or more estates would inevitably involve the comingling of each estate's property in order to make a common distribution to all of the estates' creditors, it seems to at least this court that the trustees involved would have no choice but to seek from their respective courts the requisite authority under Section 363(b) to use the estate's property as proposed before proceeding. In turn, every creditor and other party in interest

---

[66]*Saccurato v. Masters, Inc. (In re Masters, Inc.)*, 149 B.R. 289, 291-92 (E.D.N.Y. 1992); *In re Handy & Harman Ref. Group, Inc.*, 304 B.R. 49, 53 (Bankr. D. Conn. 2004); *In re Leslie Fay Co.*, 168 B.R. 294, 305 (Bankr. S.D.N.Y. 1994); *In re Pugh*, 167 B.R. 251, 253-54 (Bankr. M.D. Fla. 1994); *Billingham v. Wynn & Wynn, P.C. (In re Rothwell)*, 159 B.R. 374, 379 (Bankr. D. Mass. 1993).

[67]*In re Novak*, 383 B.R. 660 (Bankr. W.D. Mich. 2008); *In re Dalen*, 259 B.R. 586, 593-604 (Bankr. W.D. Mich. 2001).

[68]*See also Engman*, 395 B.R. at 619-29; *Dalen*, 259 B.R. at 601.

of each affected estate would have the like opportunity to object. Moreover, each objecting creditor would be in a position to contend that the interests of that particular estate would be better served by keeping whatever it claims as its own and resisting the other estate's efforts to take it away.[69] Ironically, a "best interests" review of such a proposed use under Section 363(b) is remarkably similar to what many courts have intuitively arrived at as the ultimate test for deciding whether a substantive consolidation should be ordered – a "balancing of the equities."[70] *Creditors Serv. Corp.,* 195 B.R. at 690.

> This Court must be convinced that a harm or prejudice to creditors will occur in the absence of substantive consolidation by weighing the equities favoring consolidation against the equities favoring the debtor remaining separate from the entities and the individual.

*Id.* (citations omitted).[71]

---

[69]In *Engman*, this court explained that the court's role in considering a contested Section 363(b) sale is to decide whether the disposition of the estate's property as proposed by the trustee is the best available option for the estate under the circumstances when compared to whatever the objecting party is proposing as an alternative. Granted, whatever the trustee is proposing must also be within the bounds of what he may do as a fiduciary of the estate. Nonetheless, in a contested Section 363(b) motion, the focus turns from whether the trustee's decision to sell is a sound one to whether it is the best among presumably any number of sound decisions he could have reached. 395 B.R. at 625-27.

The same concept applies here. In other words, the decision of a trustee of, say, a subsidiary to combine whatever appears to be his estate's assets with those of the parent estate's assets may be fiducially sound – i.e., the combination proposed complies with the trustee's duties of obedience, loyalty, and care. However, because Section 363(b) is involved, the trustee could not proceed without the court first authorizing the use. Consequently, creditors of that subsidiary would have the opportunity to show the court why their trustee's proposal to combine the subsidiary's assets with the parent's assets, as fiducially sound as it might be, is less in the subsidiary estate's interest then would be keeping the subsidiary's assets separate and resisting the overtures of the parent estate.

[70]A similar comparison can be made with the "best interests" or "fair and equitable" tests that would be used if a court were to instead rely upon Rule 9019(a) as the reason why a proposed voluntary consolidation of two or more bankruptcy estates required prior court approval.

[71]*Murray Indus., Inc.,* 119 B.R. at 829; *Bonham,* 226 B.R. at 97-98; *Lease-A-Fleet,* 141 B.R. at 872; *Eastgroup Properties,* 935 F.2d at 249; *Auto-Train,* 810 F.2d at 276; *In re F.A. Potts & Co.,* 23 B.R. 569, 571-72 (Bankr. E.D. Pa. 1982); *Donut Queen,* 41 B.R. at 709-10; *Snider Bros.,* 18 B.R. at 238; *In re Steury,* 94 B.R. 553, 554 (Bankr. N.D. Ind. 1988); *Crown Mach.,* 100 B.R. at 27; *Orfa Corp. of Phila.,* 129 B.R. at

In sum, then, this court concludes that Section 542 and, to a lesser extent, Section 502(j), serve as the statutory authority for what has now become commonly known as substantive consolidation – i.e., the combination of assets ostensibly owned by two or more entities with a distribution to then be made to all creditors from the common pool. Moreover, this remedy does not find its roots in general notions of equity, but rather in the practice of pre-Code courts exercising their summary jurisdiction to take control of another entity's property on an alter ego or other related theory. And finally, within this remedy lies the alternative, as expressed in such former Act cases as *Kheel* and *Flora Mir*, of trustees and debtors-in-possession voluntarily combining the assets and liabilities of their respective estates subject, however, to the objection of creditors of one or more of those estates under either Section 363(b) or Rule 9019(a) to assert that their interests would be better served if the estate's assets and liabilities were not to be combined.

Huntington Does Not Have Standing Under Section 542

Returning now to the instant case, Huntington has, without much argument from either Trustees Meoli or Richardson, established many reasons why Teleservices should be considered an instrumentality or alter ego of Cyberco. Teleservices had no employees, and its only apparent assets were some bank accounts.[72] Indeed, Teleservices was able to fulfill its part in Watson's fraudulent

---

414; *In re Affiliated Foods, Inc.*, 249 B.R. 770, 777 (Bankr. W.D. Mo. 2000); *First Nat'l Bank of El Dorado v. Giller (In re Giller)*, 962 F.2d 796, 799 (8th Cir. 1992); *In re Introgen Therapeutics, Inc.*, No. 08-12442-CAG, 2010 WL 1741105 at *9 (Bankr. W.D. Tex. Apr. 29, 2010); *Dominion Fin. Corp. v. Morfesis (In re Morfesis)*, 270 B.R. 28, 31 (Bankr. D. N.J. 2001); *Circle Land and Cattle*, 213 B.R. at 876; *Stop & Go*, 49 B.R. at 747; *In re Cooper*, 147 B.R. 678, 682 (Bankr. D. N.J. 1992).

[72]It also came to this court's attention in conjunction with a pretrial motion that the State of Delaware, which is where Teleservices was incorporated, issued a certificate in March 2004 that Teleservices was no longer in existence because Teleservices had failed to pay taxes associated with its incorporation. However, for the reasons given then, this court concluded that Teleservices continued to exist notwithstanding the certificate's declaration to the contrary. Moreover, this court is satisfied that Teleservices continued to exist as a legally recognized entity until at least January 21, 2005, which is the date

scheme only through Cyberco's executives assuming fictitious names and then pretending to speak on Teleservices' behalf.   On the other hand, not all facts favor Huntington.   For example, Teleservices' affairs, as limited and as devious as they may have been, were for the most part distinct from those of Cyberco.   For example, this is not a situation where the business of Cyberco and Teleservices became so intertwined that it was impossible to distinguish one from the other. Whatever Teleservices purloined from its victims, for the most part, flowed in a one-way direction by check or wire transfer from its account to Cyberco's account, never to return.   It was not until the waning months of both Cyberco's and Teleservices' existence that Cyberco began to transfer some monies back to the Teleservices account.   But even then, the money simply remained in the account if it was not ultimately transferred again back to Cyberco.

However, deciding whether Teleservices was or was not Cyberco's instrument or alter ego is unnecessary for, as this court has determined, the substantive consolidation Huntington seeks is rooted in Section 542 and Huntington has no standing to seek relief under that section.[73]   For

---

Teleservices's bankruptcy was commenced and an estate was then created to further pursue the rights of Teleservices and its creditors.

[73]The relief Huntington seeks also seems to be outside of the parameters of Section 542, and, therefore, substantively suspect as well. Again, Huntington's motion requests, in effect, that the Teleservices and Cyberco estates be merged into one so that, at least from Huntington's point of view, a more realistic and equitable result can be achieved. Of course, Section 542 is about gaining control of the estate's property; nothing within its four corners speaks of the wholesale restructuring of the two bankruptcy estates that Huntington has in mind. Moreover, this court is hard-pressed to determine what provision in the Code exists that would empower this court to, in effect, disregard the legal consequences of one, and, in all likelihood, two bankruptcy estates that came into being under Section 541 when the Cyberco and Teleservices cases were commenced.

Indeed, the conceptual problems of attempting through judicial fiat the merger of two separate bankruptcy estates are legion. For example, what is the petition date or order for relief for purposes of tolling the Section 546 statute of limitations or for avoiding a preferential transfer?  Must a preferential recovery by the "acquired" estate be returned if it would not have been recoverable by the "surviving" estate? If a chapter 11 plan is ultimately to be confirmed, is the best interests test under Section 1129(a)(7) to be measured as if the two estates were combined into a single hypothetical Chapter 7 case at the outset or are

43

example, at least two courts have specifically held that it is the trustee of the estate, as opposed to a creditor or other interested party, who alone has standing under Section 542 to seek the relief contemplated by that section. *Reed v. Cooper (In re Cooper)*, 405 B.R. 801 (Bankr. N.D. Tex. 2009); *Access Lending Corp. v. Scott (In re Scott)*, No. 05 B 16227, 2006 WL 126757 (Bankr. N.D. Ill. Jan. 18, 2006). It also appears that the Sixth Circuit reached the same conclusion in the unpublished case of *Watson Lumber Co. v. Campbell (In re R & L Wood Products, Inc.)*, No. 96-6509, 1998 WL 449665 (6th Cir. July 21, 1998).[74]

Moreover, a trustee's exclusive authority to commence turnover proceedings under Section 542 is nothing other than a reflection of the more general policy of designating the bankruptcy estate's trustee as the person charged with exercising the various powers afforded under Chapter 5 of the Bankruptcy Code. For example, it is equally true that it is only the trustee, as opposed to a creditor or other interested party, who is to decide whether a preference is to be avoided under

---

the two estates still to be treated separately for this test?

    Courts have certainly managed to address these difficult questions as they appear in the aftermath of a particular order to effectively merge two bankruptcy estates. However, the very fact that courts have had to adjust what would appear to most as unalterable provisions of the Bankruptcy Code in order to accommodate an outcome that all acknowledge is not actually provided for by the Code should, at the very least, give courts pause to reflect. Although comparisons to other disciplines are not always apt, Occam's razor does come to mind.

    [74]*R&L Wood Products* involved creditors of the bankrupt debtor attempting to prevent the shareholders of the debtor from enforcing a judgment that the creditors believed belonged to the estate. The Sixth Circuit contended that the creditors' action must resemble an action to recover property of the estate although it never actually cited Section 542 as the pertinent Code provisions. Be that as it may, the panel unequivocally stated that only the trustee has the authority to recover property on behalf of the estate absent the court's leave for a creditor to act in his stead. *Id.* at *4-5.

Section 547,[75] whether a postpetition transfer is to be recovered under Section 549,[76] or whether a surcharge is to be sought under Section 506(c).[77] Granted, the Sixth Circuit, like other circuits, has permitted other parties to commence Chapter 5 proceedings on the estate's behalf. *Gibson Group,*, 66 F.3d at 1446.[78] Huntington, though, has not pursued its motions based upon such derivative standing. In addition, even if it had, this court concludes that such standing would not have been recognized because there is no evidence that either Trustee Meoli or Trustee Richardson have avoided pursuing whatever rights their respective estates might have to take control of the other's property. To the contrary, both trustees have actually reached a settlement concerning such claims, albeit the settlement reached contemplates merely an exchange of money and mutual releases as opposed to the wholesale merger desired by Huntington.[79]

---

[75]*Cf. Canadian Pacific Forest Prods. Ltd. v. J.D. Irving, Ltd. (In re Gibson Group, Inc.)*, 66 F.3d 1436, 1446 (6th Cir. 1995) (recognizing that standing to commence a Section 547 or 548 avoidance action lies only with the trustee but then permitting a creditor derivative standing to take the trustee's place).

[76]*City of Farmers Branch v. Pointer (In re Pointer)*, 952 F.2d 82, 86-89 (5th Cir. 1992).

[77]*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6, 120 S. Ct. 1942, 1947 (2000).

[78]*See also Hyundai Translead, Inc. v. Jackson Truck & Trailer Repair, Inc. (In re Trailer Source, Inc.)*, 555 F.3d 231, 244-45 (6th Cir. 2009); *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 580 (3rd Cir. 2003); *La. World Exposition v. Fed. Ins. Co.*, 853 F.2d 233, 252-53 (5th Cir. 1988).

[79]The stipulation that Trustees Meoli and Richardson filed along with Rule 9019(a) motions to approve states that they have arrived at a solution that is preferable to the substantive consolidation sought by Huntington. The stipulation then sets forth an arrangement whereby the Cyberco estate will forgo pursuing any claims against the Teleservices estate, including, presumably, any substantive consolidation motion of its own, in exchange for (1) the Teleservices estate turning over to it 25% of any recovery against Huntington on account of its fraudulent transfer action, and (2) the withdrawal of any claim that the Teleservices estate might have as a creditor of the Cyberco estate. Conversely, the Cyberco estate has agreed to turnover to the Teleservices estate 75% of any recovery received on account of its separate preference action against Huntington. The settlement, though, is conditioned upon Huntington's own motions to consolidate the two cases being denied.

45

Huntington has cited a number of cases in support of its contention that it in fact does have standing to seek substantive consolidation of the Cyberco and Teleservices' estates. For example, Huntington notes that the substantive consolidation that was ordered in *Kheel* was sought by the United States as "a major creditor." But, Huntington chooses to ignore that all of the reorganization trustees of the various Chapter X estates in *Kheel* had also joined the United States in seeking that relief. As such, the question of the United States seeking the relief on its own was never an issue. 369 F.2d at 846. Likewise, while the bankruptcy court in *In re Baker & Getty Financial Services, Inc.*,[80] another case Huntington cites, may have ordered substantive consolidation based upon the creditors' motion, the opinion itself is silent as to the specific issue of standing because it does not appear to have ever been raised.

Granted, some of the other cases cited by Huntington do in fact recognize a creditor's standing to request substantive consolidation. *See In re Lahijani*, 2005 WL 4658490 at *4 (Bankr. C.D. Cal. 2005); *Bracaglia v. Manzo (In re United Stairs Corp.)*, 176 B.R. 359 (Bankr. D.N.J. 1995); *In re Tito Castro Const., Inc.*, 14 B.R. 569 (Bankr. P.R. 1981). However, none of these cases offer any meaningful analysis to justify the conclusions reached and, indeed, the court in *United Stairs* seems to have ultimately allowed standing in that case by relying upon principles associated with derivative standing. Moreover, there are any number of other cases where the courts have held that creditors do not have independent standing to seek substantive consolidation, at least where an alter ego is involved. *See, e.g., Doctors Hosp. of Hyde Park*, 308 B.R. at 323; *Simon v. New Center Hosp. (In re New Center Hosp.)*, 187 B.R. 560, 566 (E.D. Mich. 1995); *Spring Serv. Tex., Inc. v. McConnell (In re McConnell)*, 122 B.R. 41, 43-44 (Bankr. S.D. Tex. 1989).

---

[80]78 B.R. 139 (Bankr. N.D. Ohio 1987).

46

However, none of these cases is particularly persuasive one way or the other because none offers any meaningful analysis to support the conclusions reached. But what is persuasive is this – that if, as this court has concluded, Section 542 is the authority upon which Huntington must rely in order to compel the consolidation of the Cyberco and Teleservices estates, then Huntington cannot seek that relief because it clearly has no standing under that section. Therefore, both of Huntington's motions must be dismissed.

That Huntington lacks standing to pursue its own consolidation of the two bankruptcy estates, though, does not mean that Huntington is without recourse. Both Trustees Meoli and Richardson have filed in their respective cases motions to approve the settlement reached. Moreover, since the settlement contemplates (1) the Cyberco estate in effect forgoing a Section 542 turnover proceeding based upon Teleservices's property being treated as if it had belonged all along to Cyberco, and (2) the Teleservices estate actually relinquishing property that otherwise might be available to only its creditors, it would appear that both trustees' motions transcend merely the approval of settlements contemplated by FED. R. BANKR. P. 9019(a) to procuring court authorization required under Section 363(b).[81] Indeed, Huntington has already objected to such approval or authority being given and Huntington most certainly will be given the opportunity, in due course, to explain why its objection should be sustained.[82] However, that is for another day.

---

[81]*See* n. 69, *supra.*

[82]Huntington clearly has standing to object to Cyberco's side of the settlement reached. However, whether Huntington also has standing to object to Teleservices' side may turn out to be problematic since Huntington had no lending relationship with Teleservices.

## CONCLUSION

Whether the assets of the Cyberco and Teleservices estates should be combined and then distributed for the mutual benefit of all is questionable.  Granted, Teleservices may have many of the earmarks of an alter ego to Cyberco.  However, for the reasons given in a prior bench opinion, there are other reasons, such as justice, that would prevent Huntington from prevailing on an alter ego theory under applicable state law.[83]  Suffice it to say here that it is difficult for Cyberco to lay claim to Teleservices' property on the theory that Teleservices' property is in effect Cyberco's as well when all of Teleservices' property, whether it was in Teleservices' account at the time its bankruptcy was commenced or whether it is to be recovered from Huntington as fraudulent transfers, is traceable to only that which Teleservices itself stole from the various victims of the fake computer scam.[84]

---

[83]The difficulty for Huntington is that Teleservices' sole source of revenue was stolen funds and, as such, everything that was transferred from its California bank account to Huntington was stolen money as well.  Granted, in the months immediately before Cyberco's demise some money worked its way back upstream from Cyberco into the California account.  However, based upon the testimony of the Trustee's expert, the court concludes that the likelihood of that money being anything but stolen funds is extremely doubtful.

Huntington, of course, wants to keep what it received from Teleservices and has gone to great lengths to establish why it should be permitted to do so, notwithstanding the fact that its gain is directly associated with Teleservices's criminal activity.  Indeed, Huntington does not even have the excuse of itself having advanced funds to Teleservices and, as such, it cannot argue that what it was receiving from Teleservices was simply a repayment of what it had already advanced.  "[T]he general principle in Michigan is that separate corporate entities will be respected, and thus corporate veils will be pierced only to prevent fraud or injustice." *Bodenhamer Bldg. Corp. v. Architectural Research Corp.*, 873 F.2d 109, 111 (6th Cir. 1989) (quoting from *Wodogaza v. H & R Terminals*, 161 Mich. App. 746, 756, 411 N.W.2d 850, 852 (1984).  Therefore, this court is hard pressed to see how justice would be served if Huntington, through its successful assertion of some alter ego theory, were permitted to retain what clearly had been stolen by Teleservices from others and what could then be returned to them through the administration of the separate Teleservices bankruptcy estate.

[84]*See* n. 83.

48

Be that as it may, it is clearly not for Huntington to take it upon itself, at least without prior approval of this court, to presume the Cyberco trustee's authority, or, for that matter, the Teleservices trustee's authority, to combine the assets of the two estates.  Its recourse is to react to how the two trustees themselves are proposing to resolve the issue, which Huntington in fact has done.[85]

Therefore, for the reasons stated in this opinion, Huntington's motions to consolidate filed in each of the two bankruptcy cases are denied.  The court will enter separate orders in both cases consistent with this opinion.

_7/2/10_

Hon. Jeffrey R. Hughes
United States Bankruptcy Judge

Signed this 2nd day of July, 2010
at Grand Rapids, Michigan.

---

[85]Huntington has made much of the fact that the failure to consolidate the two estates will result in an inequitable distribution because only a few creditors have filed proofs of claim in Teleservices.  The paucity of filed claims in the Teleservices case was at first puzzling given that any victim of Watson's scheme to secure financing based upon fraudulent purchases from Teleservices would presumably have a claim not only against the Cyberco estate but also against the Teleservices estate.  However, the court has since discovered that the petitioner, who again was the state-appointed receiver for Teleservices, never included all of the defrauded finance companies in the creditor matrix.  Consequently, it would appear that many of the victims of Teleservices's fraud would not have received formal notice of their right to file a proof of claim in that case.

The court anticipates that the creditors who have in fact filed timely claims in Teleservices will contend that these other defrauded entities are time-barred from now filing claims. *See* 11 U.S.C. § 502(b)(9) and FED. R. BANKR. P. 3002(a).  However, the court is concerned that precluding these claims would result in an abuse of process if in fact the claimants were not made aware of the Teleservices case when it was first filed. Therefore, the court intends to schedule a sua sponte hearing pursuant to its authority under Section 105(a) to determine why Trustee Meoli should not identify all such potential claimants and then invite them to file claims against the estate. Trustee Meoli and any other party in interest, including the few Teleservices creditors who have filed timely claims, may then challenge whatever newly filed claims there may be as tardy with those claimants in turn being given the opportunity to have their claims still allowed based upon the equities that Section 502(j) permits the court to consider.

49